DAVID L. NEALE (SBN 141225)
JULIET Y. OH (SBN 211414)
GWENDOLEN D. LONG (CA admission pending)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: dln@lnbyb.com, jyo@lnbyb.com, gdl@lnbyb.com

Proposed Attorneys for Chapter 11 Debtors
And Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re<br><br>FIRST NATIONAL BUILDING I, LLC and FIRST NATIONAL BUILDING II, LLC,<br><br>Debtors.<br><br>__  Affects First National Building I, LLC Only<br><br>__  Affects First National Building II, LLC Only<br><br>X  Affects Both Debtors | Case No. 1:10-bk-22745-GM<br>Case No. 1:10-bk-22747-GM<br><br>Chapter 11<br><br>**DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER AUTHORIZING DEBTORS TO USE CASH COLLATERAL ON AN INTERIM BASIS PENDING A FINAL HEARING; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:  October 13, 2010<br>Time: 10:00 a.m.<br>Place: Courtroom "303"<br>           21041 Burbank Blvd.<br>           Woodland Hills, California |

1

**SUMMARY**

Pursuant to Local Bankruptcy Rules 2081-1(a)(9), 4001-2 and 9075-1, 11 U.S.C. Section 363(c), and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), First National Building I, LLC, an Oklahoma limited liability company ("FNB I"), and First National Building II, LLC, an Oklahoma limited liability company ("FNB II," and together with FNB I, the "Debtors"), the debtors and debtors in possession in the above-captioned chapter 11 bankruptcy cases, hereby move, on an emergency basis (the "Motion"), for the entry of an order authorizing the Debtors to use cash collateral on an emergency interim basis pending a final hearing in accordance with the Debtors' joint operating budget (the "Budget"), a copy of which is attached as Exhibit "1" to the Declaration of M. Aaron Yashouafar (the "Yashouafar Declaration") filed concurrently herewith.

Each of the Debtors filed a voluntary petition under Chapter 11 of 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code") on October 7, 2010 (the "Petition Date"). The Debtors are managing their financial affairs and operating their bankruptcy estates as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. The Debtors have each requested that their cases be jointly administered.

The Debtors are the co-owners of the real property commonly known as the First National Center and located at 120 N. Robinson Avenue in Oklahoma City (the "Property"). The Property is a 33-story historic office building located in the central business district in Oklahoma City and contains approximately 950,000 square feet of rentable space. The Property is currently the largest building (in square footage) and the second tallest building in Oklahoma City and is recognized for its notable architectural resemblance to the Empire State Building in New York City. As set forth in the Memorandum of Points and Authorities and the Yashouafar Declaration filed concurrently herewith, the Debtors believe that the current fair market value of the Property is at least $28 million.

On or about May 18, 2007, the Debtors entered into a loan agreement with Capmark Bank, a Utah industrial bank, and Capmark CDF Subfund VI LLC (collectively, the "Lender"),

pursuant to which the Debtors obtained a loan from the Lender in the aggregate principal amount which was not to exceed $23,080,000 (the "Loan"). The obligations of the Debtors in connection with the Loan and related promissory notes are secured by a Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing (the "Mortgage") recorded against the Property. The Lender asserts that it is currently owed approximately $20,927,413 under the Loan, secured by the Property, the fixtures and personal property located at or on the Property, as well as the Debtors' cash, which is derived primarily, if not entirely, from rent received by the Debtors from their tenants.

In addition to the Bank, there are a number of subcontractors who have recorded mechanic's liens against the Property. The Debtors believe that the total amount of the mechanic's liens recorded against the Property, as of the Petition Date, was approximately $506,000.[1] Additionally, there appears to be a judgment lien recorded by Oklahoma Gas & Electric Company and tax liens recorded by the Oklahoma Tax Commission against the Property. Even if the foregoing liens are valid and enforceable (which the Debtors do not concede), such liens against the Property do not result in a security interest against the Debtors' cash and rent revenue.

The Debtors estimate that the Property will generate rent revenue of approximately $470,000 per month. The Debtors must be able to use the rent revenue generated from the lease of space in the Property to maintain the Property and pay operating expenses relating to the Property, including, among other things, insurance, utilities, parking, security services, janitorial services and other operational costs associated with the Property. Without the ability to use cash collateral to pay the ongoing operating expenses of the Property, the Debtors will not be able to continue maintaining the Property, which will ultimately result in the loss of tenants and rent revenue, to the detriment of all parties in interest.

---

[1] The Debtors do not acknowledge the validity of any of the mechanic's liens that have been recorded against the Property and expressly reserve all of their rights, claims and defenses with respect to such liens.

3

Pursuant to the Motion, the Debtors seek Court authority to use their cash collateral in order to pay the expenses of maintaining and operating the Property in accordance with the Budget. In addition, the Debtors seek authority to use their cash collateral to pay all quarterly fees owing to the Office of the United States Trustee and all expenses owing to the Clerk of the Bankruptcy Court. The Debtors also seek authority to deviate from the line items contained in the Budget by not more than 10%, on both a line item and aggregate basis, with any unused portions to be carried over into the following week(s).

Given that the Lender is an oversecured creditor protected by a significant equity cushion (of approximately 33%) and the Debtors' continued operation of the Property, the Debtors submit that the Lender will remain adequately protected despite the Debtors' use of cash collateral pursuant to the terms proposed in the Motion. Additionally, the use of cash collateral is critical to the Debtors' ability to formulate and implement an effective reorganization strategy for the benefit of all creditors.

Pursuant to Bankruptcy Rule 4001(b)(2), while the Court cannot conduct a final hearing on the Motion earlier than fourteen (14) days after service of the Motion, the Court may conduct a preliminary hearing before such fourteen day period expires to enable the Debtors to use cash collateral as is necessary to avoid immediate and irreparable harm to the Debtors' estates pending a final hearing. Here, the Debtors cannot survive fourteen days without any use of cash collateral. The Debtors must be able to pay expenses in accordance with the Budget pending a final hearing in order to avoid immediate and irreparable harm.

## **ADDITIONAL INFORMATION**

The relief sought in the Motion is based upon Local Bankruptcy Rules 2081-1(a)(9), 4001-2 and 9075-1, Section 363(c) of the Bankruptcy Code, and Bankruptcy Rules 4001 and 9014, this Motion, the annexed Memorandum of Points and Authorities, the Yashouafar Declaration and the Declaration of Simon Barlava filed concurrently herewith in support of the Motion, the arguments and statements of counsel to be made at the hearing on the Motion, and any other evidence properly presented to the Court at or prior to the hearing on the Motion.

In order to provide maximum notice of this Motion, concurrently with the filing of this Motion with the Court (on October 8, 2010), the Debtors have served a copy of this Motion and all supportive papers (including notice of the hearing) upon the Office of the United States Trustee, all secured creditors and their counsel (if known), and the 20 largest unsecured creditors of each of the Debtors via overnight mail.  These parties will receive delivery of the Motion and all supportive papers by not later than the morning of Monday, October 11, 2010.

**WHEREFORE**, the Debtors respectfully request that this Court hold an emergency hearing on the Motion and enter an order:

(1)    affirming the adequacy of the Notice given herein;

(2)    granting the Motion on an interim basis pending a final hearing thereon;

(3)    authorizing the Debtors to use cash collateral to (i) pay all of the expenses set forth in the Budget, with authority to deviate from the line items contained in the Budget by not more than 10%, on both a line item and aggregate basis, with any unused portions to be carried over into the following week(s) and (ii) pay all quarterly fees owing to the Office of the United States Trustee and all expenses owing to the Clerk of the Bankruptcy Court;

(4)    setting a final hearing on the Motion; and

(5)    granting such other and further relief as the Court deems just and proper under the circumstances.

Dated:  October 8, 2010         FIRST NATIONAL BUILDING I, LLC and
                                FIRST NATIONAL BUILDING II, LLC


                                By:    */s/ Juliet Y. Oh*
                                      DAVID L. NEALE
                                      JULIET Y. OH
                                      GWENDOLEN D. LONG
                                      LEVENE, NEALE, BENDER, YOO
                                          & BRILL L.L.P.
                                      Proposed Attorneys for Chapter 11
                                      Debtors and Debtors in Possession

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.  STATEMENT OF FACTS

**A.  Background.**

1. On October 7, 2010, First National Building I, LLC, an Oklahoma limited liability company ("<u>FNB I</u>"), and First National Building II, LLC, an Oklahoma limited liability company ("<u>FNB II</u>," and together with FNB I, the "<u>Debtors</u>"), the debtors and debtors in possession in the above-captioned chapter 11 bankruptcy cases, each filed a voluntary petition under Chapter 11 of 11 U.S.C. § 101 *et seq.* (the "<u>Bankruptcy Code</u>").  The Debtors are managing their financial affairs and operating their bankruptcy estates as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  The Debtors have each requested that their cases be jointly administered.

2. In 2006, the Debtors jointly acquired, as tenants in common, the real property commonly known as the First National Center and located at 120 N. Robinson Avenue in Oklahoma City (the "<u>Property</u>").  The Property is a 33-story historic office building located in the central business district in Oklahoma City and contains approximately 950,000 square feet of rentable space.  The Property is currently the largest building (by square footage) and second tallest building in Oklahoma City and is recognized for its notable architectural resemblance to the Empire State Building in New York City.

3. On or about May 18, 2007, the Debtors entered into a loan agreement with Capmark Bank, a Utah industrial bank, and Capmark CDF Subfund VI LLC (collectively, the "<u>Lender</u>"), pursuant to which the Debtors obtained a loan from the Lender in the aggregate principal amount which was not to exceed $23,080,000 (the "<u>Loan</u>").  A true and correct copy of the Loan agreement is attached as Exhibit "2" to the Declaration of M. Aaron Yashouafar (the "<u>Yashouafar Declaration</u>") filed concurrently herewith.  The Loan provided for, among other things, the repayment of the Loan, including accrued and unpaid interest, by June 9, 2010, with two options to extend the term of the Loan for one year each.  The obligations of the Debtors in connection with the Loan and related promissory notes are secured by a Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing (the "<u>Mortgage</u>") recorded against the

Property. A true and correct copy of the recorded Mortgage is attached as Exhibit "3" to the Yashouafar Declaration filed concurrently herewith.

4. The Loan was obtained by the Debtors for the purpose of funding, among other things, (i) tenant improvements and leasing commissions, (ii) debt service and operating expense shortfalls, and (iii) capital improvement advances.

5. At the time the Debtors acquired the Property, in 2006, the occupancy rate in the Property was a dismal 33%. Since then, the Debtors have invested over $8.5 million in tangible improvements to the Property, including the installation of a fire life system, abatement of asbestos, and extensive remodeling of common areas. The Debtors have also invested substantial time and resources in rehabilitating the public image and reputation of the Property, including, for example, re-opening its "Grand Banking Hall" to public access and permitting special event rentals in that historic landmark space.

6. In addition, following their acquisition of the Property, the Debtors entered into a Property Management Agreement (the "Management Agreement") with Milbank Real Estate Services, Inc. ("Milbank"), pursuant to which Milbank acts as the Debtors' exclusive managing agent for the Property. In accordance with the Management Agreement, Milbank, among other things, procures and negotiates lease agreements with tenants for the Property, collects rents from tenants in the Property, deposits such rents into an operating account maintained at United Central Bank (an FDIC-insured bank), and disburses funds from the operating account to pay operating expenses related to the Property. In consideration for such services, Milbank receives compensation equal to three percent (3%) of all gross revenues actually collected from the Property, with such compensation computed and paid on a monthly basis.

7. As a direct result of the efforts of the Debtors and Milbank, the occupancy rate in the Property has nearly doubled in the last few years, to the current occupancy rate of approximately 64%.

8. On April 10, 2010, the Debtors timely exercised their option to extend the term of the Loan for an additional year, from June 9, 2010 to June 9, 2011. Based on the business records

maintained by the Debtors and Milbank in connection with the Property, all of the required conditions for exercising the first option to extend the term of the Loan were met, specifically, as follows:

    a.    The Property had earned income sufficient to exceed the minimum debt coverage ratio of 1.5:1.0 continuously since at least January, 2010.

    b.    The Property had an occupancy rate of at least 63% by *bona fide* tenants since at least three months prior to the maturity date of the Loan.

    c.    Any tenant that the Lender could potentially attempt to claim as unauthorized or disqualified for purposes of computing the foregoing two conditions had been continuously leasing its space for the requisite period, and the Lender had actual knowledge thereof and did not make any specific objection or rejection to the Debtors or Milbank.

    d.    The required fee for the exercise of the option to extend the term of the Loan was computed to be $99,638.61, and was tendered to the Lender in such amount with good and sufficient funds.

    e.    According to the provisions of the Loan agreement governing the Debtors' option to extend the term of the Loan, the Lender became entitled to reasonably verify the continued satisfaction of the conditions for the Debtor's exercise of such option. All supporting documents requested by the Lender and its attorneys were promptly made available. In addition, physical access to the Property was provided to the Lender on multiple occasions during the month of June 2010, ostensibly to allow the Lender to reasonably verify that the conditions for the Debtors' exercise of their extension option were met.

9.    The Debtors paid every installment payment due under the terms of the Loan through the original maturity date of the Loan (including the June 2010 interest payment).

10.    Notwithstanding all of the foregoing, on or about June 18, 2010, the Lender filed a petition for foreclosure against the Debtors in the District Court of the State of Oklahoma,

Oklahoma County ("State Court"), thereby commencing that State Court action bearing the number CJ-2010-5129. Pursuant to its petition for foreclosure, the Lender alleged that the Loan had matured and sought to foreclose against the Property. Also in its petition for foreclosure, the Lender asserted a claim against the Debtors in an amount exceeding $20.0 million. In connection with the State Court action, the Lender filed a motion seeking the appointment of a receiver to operate and manage the Property.

11. Despite the State Court's requests that the parties meet and confer regarding a possible extension of the Loan on terms mutually agreeable to the Lender and the Debtors, the Lender refused to participate in any such settlement discussions.

12. The Debtors believe that the appointment of a receiver will result in considerable irreparable damage as it will diminish the value of the Property and hinder the ability of the Debtors to extend the term of the Loan, refinance and/or sell the Property. The appointment of a receiver will likely result in the following immediate and negative consequences: (i) the Debtors' ability to retain existing tenants and attract new tenants will be severely compromised due to the public perception that the Property may be insolvent, poorly managed or poorly maintained, resulting in a decline in rental income and an increase in the lease default rate; (ii) the cost of operating and maintaining the Property will increase with the added cost of a receiver; (iii) the Property is unlikely to be managed properly or effectively, particularly given the unique characteristics of the Property, a historic landmark building with nearly 1 million square feet of rentable space, and the large number of existing tenants; (iv) the resale value of the Property to potential buyers will immediately drop; and (v) the Debtors' ability to obtain any refinancing or debt restructuring with any other lender will be jeopardized.

13. As a result of all the foregoing, the Debtors sought protection under Chapter 11 of the Bankruptcy Code in order to continue operating the Property in an effective and cost-efficient manner, to preserve and maximize the value of the Property, and to have the ability and opportunity to sell or refinance the Property, all of which will allow the Debtors to repay the Loan and their other debts for the benefit of all creditors.

**B.     Description Of The Debtors' Assets And Debts.**

14.    <u>The Property</u>.  The primary assets of the Debtors' bankruptcy estates consist of the Property and the fixtures and personal property located at or on the Property.  Pursuant to an appraisal commissioned by the Lender from Cushman & Wakefield of Texas, Inc. (the "<u>Lender's Appraisal</u>"), as of December 8, 2008, the Property was valued at approximately $26 million (in "as-is" condition).  A true and correct copy of the written report reflecting the results of the Lender's Appraisal is attached as Exhibit "4" to the Yashouafar Declaration filed concurrently herewith.  The Lender's Appraisal projected that the value of the Property would continue to increase over the next five years to a value of approximately $39.5 million "upon stabilization."  The Debtors estimate that the current value of the Property is at least $28 million, which is entirely consistent with the conclusions set forth in the Lender's Appraisal.

15.    <u>Lender Debt</u>.  The Debtors' primary creditor is the Lender.  In its petition for foreclosure filed in State Court, the Lender asserted that it was owed the principal sum of $19,927,721.68, plus accrued interest in the sum of $159,853.20 (as of June 9, 2010), plus interest at the rate of $6,940.81 per day from and after June 9, 2010, plus such other costs, charges, expenses and attorneys' fees as may be allowed by law.  Accordingly, even by the Lender's own calculations (which the Debtors dispute), the Lender holds a claim as of October 8, 2010 in the approximate sum of $20,927,413, plus other allowed costs, charges, expenses and attorneys' fees (if any).  As noted above, the obligations of the Debtors in connection with the Loan are secured by the Mortgage, pursuant to which the Lender asserts liens against the Property, the fixtures and personal property located at or on the Property, as well as the Debtors' cash, which is derived primarily, if not entirely, from rent received by the Debtors from their tenants.

16.    <u>Liens</u>.  In addition to the Bank, there are a number of subcontractors who have recorded mechanic's liens against the Property.  The Debtors believe that the total amount of the mechanic's liens recorded against the Property, as of the Petition Date, was approximately $506,000.[2]  Additionally, there appears to be a judgment lien recorded by Oklahoma Gas &

---

[2] The Debtors do not acknowledge the validity of any of the mechanic's liens that have been recorded against the Property and expressly reserve all of their rights, claims and defenses with respect to

Electric Company and tax liens recorded by the Oklahoma Tax Commission against the Property. Even if the foregoing liens are valid and enforceable (which the Debtors do not concede), such liens against the Property do not result in a security interest against the Debtors' cash and rent revenue.

17.   In addition to the debts described above, the Debtors have a total of approximately $3.5 million of unsecured debt.

**C.    The Need For Use Of Cash Collateral And Proposed Operating Budget.**

18.   A copy of the Debtors' joint operating budget for the approximately 45-day period following the Petition Date (the "Budget") is attached as Exhibit "1" to the Yashouafar Declaration filed concurrently herewith. The Budget reflects rent revenue of approximately $470,000 per month which is expected to be generated by the Property and the expenses expected to be incurred to maintain and operate the Property, including, among other things, insurance, utilities, parking, security services, janitorial services and other operational costs associated with the Property.

19.   Without the ability to use cash collateral to pay the ongoing operating expenses of the Property, the Debtors and Milbank will not be able to continue maintaining the Property, which will ultimately result in the loss of tenants and rent revenue.

20.   Pursuant to the Motion, the Debtors seek Court authority to use their cash collateral in order to pay the expenses of maintaining and operating the Property in accordance with the Budget. In addition, the Debtors seek authority to use their cash collateral to pay all quarterly fees owing to the Office of the United States Trustee and all expenses owing to the Clerk of the Bankruptcy Court. The Debtors also seek authority to deviate from the line items contained in the Budget by not more than 10%, on both a line item and aggregate basis, with any unused portions to be carried over into the following week(s).

///
///
///

---

such liens.

///

## II. DISCUSSION

**A. The Debtors Must Be Authorized To Use Cash Collateral To Operate, Maintain And Preserve The Property In Accordance With The Budgets.**

The Debtors' use of property of their estates is governed by Section 363 of the Bankruptcy Code. Section 363(c)(l) provides in pertinent part:

> If the business of the debtor is authorized to be operated under section. . .1108. . . of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C.§ 363(c)(l). A debtor in possession has all of the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with Section 363. *See* 11 U.S.C. §1107(a).

"Cash collateral" is defined as "cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents in which the estate and an entity other than the estate have an interest. . . ." 11 U.S.C. §363(a). Section 363(c)(2) establishes a special requirement with respect to "cash collateral," providing that the trustee or debtor in possession may use "cash collateral" under subsection (c)(l) if:

> (A) each entity that has an interest in such cash collateral consents; or
> (B) the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section.

See 11 U. S.C. §363(c)(2)(A) and (B).

It is well settled that it is appropriate for a Chapter 11 debtor to use cash collateral for the purpose of maintaining and operating its property. 11 U.S.C. § 363(c)(2)(B); *In re Oak Glen R-Vee*, 8 B.R. 213, 216 (Bankr. C.D. Cal. 1981); *In re Tucson Industrial Partners*, 129 B.R. 614 (9th Cir. BAP 1991). In addition, where the debtor is operating a business, it is extremely important that the access to cash collateral be allowed in order to facilitate the goal of

reorganization: "the purpose of Chapter 11 is to rehabilitate debtors and generally access to cash collateral is necessary to operate a business." *In re Dynaco Corporation*, 162 B.R. 389 (Bankr. D.N.H. 1993), *quoting In re Stein*, 19 B.R. 458, 459. (Bankr. E.D. Pa. 1982).

The only current source of revenue available to the Debtors to use to maintain and operate the Property is the rent revenue being generated by the Property. If the Debtors are not permitted to use their cash collateral to maintain and operate the Property, it is all but certain that the Debtors' existing tenants will leave, taking with them all of the revenue that the Property is currently generating.

The operating expenses that the Debtors must be able to pay during the 45-day period following the Petition Date are set forth in the Budget. For the reasons noted above, the Debtors' inability to pay these operating expenses would cause immediate and irreparable harm to the Debtors and their bankruptcy estate. In addition to the foregoing expenses, the Debtors seek authority to use cash collateral to pay all quarterly fees owing to the Office of the United States Trustee and all expenses owing to the Clerk of the Bankruptcy Court. The Debtors also seek authority to deviate from the line items contained in the Budget by not more than 10%, on both a line item and aggregate basis, with any unused portions to be carried over into the following week(s).

**B.    The Lender Is Adequately Protected By An Adequate Equity Cushion And The Debtors' Continued Operation Of The Property.**

To the extent that an entity has a valid security interest in the revenues generated by property, those revenues constitute "cash collateral" under Section 363(a) of the Bankruptcy Code. Pursuant to Section 363(c)(2), the Court may authorize the debtor to use a secured creditor's cash collateral if the secured creditor is adequately protected. *In re Mellor*, 734 F.2d 1396, 1400 (9th Cir. 1984). *See also In re O'Connor*, 808 F.2d 1393, 1398 (10th Cir. 1987); *In re McCombs Properties VI, Ltd.*, 88 B.R. 261, 265 (Bankr. C.D. Cal. l988) ("*McCombs*").

Pursuant to the Supreme Court case of *United Savings Association v. Timbers of Inwood Forest Associates*, 108 S.Ct. 626, 629 (1988) ("*Timbers*") and subsequent case law, the property

interest that a debtor must adequately protect pursuant to Sections 361(1) and (2) of the Bankruptcy Code is only the value of the lien that secures the creditor's claim. *Timbers*, 108 S.Ct. at 630. *See also McCombs, supra*, at 266. Section 506(a) "limit[s] the secured status of a creditor (i.e., the secured creditor's claim) to the lesser of the [allowed amount of the] claim or the value of the collateral." *McCombs* at 266.

The Ninth Circuit made clear in *Mellor*, 734 F.2d at 1401, that in the case of an oversecured creditor, an equity cushion of 20% is considered clear adequate protection of a secured creditor's interest in cash collateral. *See also, In re McGowan*, 6 B.R. 241, 243 (Bankr. E.D. Pa. 1980) (holding a 10% cushion is sufficient to be adequate protection); *In re Rogers Development Corp.*, 2 B.R. 679, 685 (Bankr. E.D. Va. 1980) (court decided that an equity cushion of approximately 15% to 20% was sufficient adequate protection to the creditor, even though the debtors had no equity in the property).

Here, the Lender is oversecured and adequately protected by a significant equity cushion. As discussed above, the current estimated value of the Property is approximately $28 million. The current amount of the Lender's claim, even by the Lender's own calculations (which the Debtors dispute), is approximately $20,927,413, plus other allowed costs, charges, expenses and attorneys' fees (if any). Accordingly, the Lender is secured by an equity cushion of approximately 33%, which far exceeds the 20% equity cushion which the Ninth Circuit held in *Mellor* constitutes clear adequate protection of a secured creditor's interest in cash collateral.

Additionally, the law is also clear that the preservation of the value of a secured creditor's lien is sufficient to provide adequate protection to a secured creditor when a debtor seeks to use cash collateral. *In re Triplett*, 87 B.R. 25 (Bankr. W.D.Tex. 1988). *See also In re Stein*, 19 B.R. 458 (Bankr. E.D.Pa. 1982). The *Stein* Court determined that the use of cash collateral was necessary to the continued operations of the debtor, and that the creditor's secured position could only be enhanced by the continued operation of the debtor's business. *See also, In re McCombs*, supra, where the court determined that the debtor's use of cash collateral for needed repairs,

renovations and operating expenses eliminated the risk of diminution in the creditor's interest in the cash collateral and such use would more likely increase cash collateral.

As reflected in the Budget, the Debtors' continued operation and maintenance of the Property will adequately protect the Lender (and any other secured creditors) as the Debtors will continue to generate revenue and preserve the value of the Property. Other Courts have determined that the Debtors' continued business operations can constitute the adequate protection of a secured creditor. *See Matter of Pursuit Athletic Footwear, Inc.,* 193 B.R. 713 (Bankr. D. Del. 1996); *In re Newark Airport/Hotel Ltd. Partnership*, 156 B.R. 444, 450 (Bankr. D.N.J. 1993); *In re Dynaco*, 162 B.R. 389, 394-5 (Bankr. D.N.H. 1993); *In re Immenhausen Corp.*, 164 B.R. 347, 352 (Bankr. M.D. Fla. 1994).

Additionally, in determining adequate protection, Courts have stressed the importance of promoting a debtor's reorganization. In *In re O'Connor*, *supra*, the Tenth Circuit stated:

> "In this case, Debtors, in the midst of a Chapter ll proceeding, have proposed to deal with cash collateral for the purpose of enhancing the prospects of reorganization. This quest is the ultimate goal of Chapter 11. Hence, the Debtor's efforts are not only to be encouraged, but also their efforts during the administration of the proceeding are to be measured in light of that quest. Because the ultimate benefit to be achieved by a successful reorganization inures to all the creditors of the estate, a fair opportunity must be given to the Debtors to achieve that end. Thus, while interests of the secured creditor whose property rights are of concern to the court, the interests of all other creditors also have bearing upon the question of whether use of cash collateral shall be permitted during the early stages of administration."

808 F.2d at 1937.

The use of cash collateral is critical to the Debtors' ability to implement an effective reorganization strategy for the benefit of all creditors. As demonstrated herein, the use of the Debtors' cash collateral, in accordance with the Budget, will preserve and maximize the Debtors' primary assets (essentially, the Property and the fixtures and personal property located on or at the Property) for the benefit of the estates and the Debtors' creditors. If the Debtors are not permitted to use cash collateral to maintain and operate the Property, the Debtors will very likely lose their existing tenants and will have no ability to obtain new replacement tenants. The very source of the Debtors' cash collateral – namely, the rent generated by the lease of space in the

Property – will evaporate, and the Debtors will be left with a vacant Property. On the other hand, if the Debtors are authorized to use their cash collateral, the Debtors will be able to continue maintaining the Property and generating cash flow so that the Debtors can simultaneously pursue longer term strategies for the restructuring of their financial affairs, including, without limitation, the further leasing of space in the Property, the refinancing of the Property, or the sale of the Property. Clearly, the use of cash collateral will only enhance the prospect of the Debtors' reorganization.

**C.    The Procedural Requirements Regarding Approval Of The Motion Have Been Satisfied.**

Rules 4001(b) and 4001(c) of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") set forth procedural requirements for obtaining use of cash collateral. There are three general procedural requirements. First, the Motion must contain a copy of the proposed form of order granting the Motion, which has been done by attaching the proposed order as Exhibit "5" to the Yashouafar Declaration filed concurrently herewith. Second, the Motion must provide a concise statement of the relief requested, which was done above. Third, the Motion is required to be served on any entity with an interest in the Debtors' cash collateral, any committee appointed or the twenty largest unsecured creditors if there is no committee, and on such other parties as the Court directs. Here, the Debtors have served a copy of the Motion and all supportive papers upon the Office of the United States Trustee, all known secured creditors and their counsel (if known), the twenty largest unsecured creditors of each of the Debtors, and parties requesting special notice via overnight mail. These parties will receive delivery of the Motion and all supportive papers by not later than the morning of Monday, October 11, 2010. Accordingly, the Motion complies with the requirements of Bankruptcy Rules 4001(b) and 4001(c).

In addition, in accordance with Bankruptcy Rule 4001(c)(1)(B) and Local Bankruptcy Rule 4001-2, the Debtors submit that the relief requested by the Debtors pertaining to the Debtors' use of cash collateral does not contain any of the following provisions:

| **Provision** | |
|---|---|
| Cross-collateralization clauses | No |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the validity, perfection or amount of the secured party's pre-petition lien or debt or the waiver of claims against the secured creditor. | No |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the relative priorities of the secured party's pre-petition lien. | No |
| Provisions that operate, as a practical matter, to divest the Debtor of any discretion in the formulation of a plan or administration of the estate or to limit access to the court to seek any relief under other applicable provision of law. | No |
| Waivers of 11 U.S.C. § 506(c), unless the waiver is effective only during the period in which the Debtor is authorized to use cash collateral or borrow funds. | No |
| Releases of liability for the creditor's alleged prepetition torts or breaches of Contract. | No |
| Waivers of avoidance actions arising under the Bankruptcy Code. | No |
| Provisions that deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt | No |
| Provisions that provide disparate treatment for the professionals retained by a creditors' committee from that provided for the professionals retained by the Debtor with respect to a professional fee carve out | No |
| Provisions that prime any secured lien | No |
| Automatic relief from the automatic stay upon default, conversion to chapter 7, or appointment of a trustee. | No |
| Waivers of procedural requirements, including those for foreclosure mandated under applicable non-bankruptcy law, and for perfection of replacement liens. | No |
| Adequate protection provisions which create liens on claims for relief arising under 11 U.S.C. §§ 506(c), 544, 545, 547, 548 and 549. | No |
| Waivers, effective on default or expiration, of the Debtor's right to move for a court order pursuant to 11 U.S.C. § 363(c)(2)(B) authorizing the use of cash collateral in the absence of the secured party's consent | No |

17

| **Provision** | |
|---|---|
| Provisions that grant a lien in an amount in excess of the dollar amount of cash collateral authorized under the applicable cash collateral order. | No |
| Provisions providing for the paying down of prepetition principal owed to a creditor. | No |
| Findings of fact on matters extraneous to the approval process. | No |

### III.  CONCLUSION

**WHEREFORE**, the Debtors respectfully request that this Court hold a hearing on the Motion and enter an order:

(1)  affirming the adequacy of the Notice given herein;

(2)  granting the Motion on an interim basis pending a final hearing thereon;

(3)  authorizing the Debtors to use cash collateral to (i) pay all of the expenses set forth in the Budget, with authority to deviate from the line items contained in the Budget by not more than 10%, on both a line item and aggregate basis, with any unused portions to be carried over into the following week(s) and (ii) pay all quarterly fees owing to the Office of the United States Trustee and all expenses owing to the Clerk of the Bankruptcy Court;

(4)  setting a final hearing on the Motion; and

(5)  granting such other and further relief as the Court deems just and proper under the circumstances.

Dated: October 8, 2010                    FIRST NATIONAL BUILDING I, LLC and
                                          FIRST NATIONAL BUILDING II, LLC


                                          By: */s/ Juliet Y. Oh*
                                              DAVID L. NEALE
                                              JULIET Y. OH
                                              GWENDOLEN D. LONG
                                              LEVENE, NEALE, BENDER, YOO
                                                & BRILL L.L.P.
                                              Proposed Attorneys for Chapter 11
                                              Debtors and Debtors in Possession