1  DAVID L. NEALE (SBN 141225)
   JULIET Y. OH (SBN 211414)
2  GWENDOLEN D. LONG (CA admission pending)
   LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
3  10250 Constellation Boulevard, Suite 1700
4  Los Angeles, California 90067
   Telephone:  (310) 229-1234
5  Facsimile:  (310) 229-1244
   Email: dln@lnbyb.com, jyo@lnbyb.com, gdl@lnbyb.com
6
7  Proposed Attorneys for Chapter 11 Debtor
   and Debtor-in-Possession
8

9              **UNITED STATES BANKRUPTCY COURT**

10              **CENTRAL DISTRICT OF CALIFORNIA**

11              **SAN FERNANDO VALLEY DIVISION**

12  In re                               ) Case No. 1:10-bk-22745-GM
                                        )
13  FIRST NATIONAL BUILDING I, LLC,     ) Chapter 11
                                        )
14          Debtor.                     )
                                        ) **DECLARATION OF M. AARON**
15                                      ) **YASHOUAFAR IN SUPPORT OF FIRST**
                                        ) **DAY MOTIONS**
16                                      )
                                        )
17                                      ) Date:    October 13, 2010
                                        ) Time:    10:00 a.m.
18                                      ) Place:   Courtroom "303"
                                        )          21041 Burbank Blvd.
19                                      )          Woodland Hills, California
                                        )
20  _____

21       I, M. Aaron Yashouafar, being of lawful age, competent, and duly sworn upon oath, state

22  the following facts from my personal knowledge:

23       1.    I am the manager of FNC-MI, LLC, which is the manager of First National

24  Building I, LLC ("FNBI"), and chief executive officer of Milbank Real Estate Services, Inc.

25  ("Milbank"), which is the property manager for FNBI.  In such capacity, I have personal

26  knowledge and have reviewed the regularly kept business records of the duly appointed and

27  approved property management firm for the property at issue.

28

                                        1

1    2.    I submit this declaration in support of (i) the *Debtor's Emergency Motion for*

2    *Entry of an Order for Joint Administration of Cases*; (ii) the *Debtors' Emergency Motion for*

3    *Entry of an Order Authorizing Debtors to Use Cash Collateral on an Interim Basis Pending a*

4    *Final Hearing* the ("Cash Collateral Motion"); (iii) the *Debtors' Emergency Motion for Entry of*

5    *an Order Authorizing the Continued Use of Debtors' Cash Management System*, and (iv) the

6    *Debtors' Emergency Motion for Entry of an Order Authorizing Debtors to Provide Adequate*

7    *Assurance of Future Payment to Utility Companies Pursuant to 11 U.S.C. § 366.*

8    **Background**

9    3.    On October 7, 2010, FNBI filed a voluntary petition under Chapter 11 of the

10    Bankruptcy Code.    FNBI is operating its business and managing its financial affairs and

11    operating its bankruptcy estate as a debtor in possession.

12    4.    FNBI and First National Building II, LLC ("FNBII" and together with FNBI, the

13    "Debtors") together, jointly own, as tenants in common, the property commonly known as First

14    National Center, and located in downtown Oklahoma City, Oklahoma at 120 N. Robinson

15    Avenue (the "Property").    FNBII is also a Chapter 11 debtor in possession in a bankruptcy case

16    filed on October 7, 2010, and pending before this Court (Case No. 10-22747).

17    5.    The Debtors jointly acquired the Property in 2006.    The Property is a 33-story

18    historic office building located in the central business district in Oklahoma City and contains

19    approximately 950,000 square feet of rentable space.    The Property is currently the largest

20    building (by square footage) and second tallest building in Oklahoma City and is recognized for

21    its notable architectural resemblance to the Empire State Building in New York City.    Upon

22    information and belief, the current fair market value of the Property is at least $28 million.

23    6.    On or about May 18, 2007, the Debtors entered into a loan agreement with

24    Capmark Bank, a Utah industrial bank, and Capmark CDF Subfund VI LLC (collectively, the

25    "Lender"), pursuant to which the Debtors obtained a loan from the Lender which was not to

26    exceed $23,080,000 (the "Loan"). A true and correct copy of the Loan agreement is attached

27    hereto as Exhibit "2."    The Loan was obtained by the Debtors for the purpose of funding, among

28

2

1  other things: (i) tenant improvements and leasing commissions, (ii) debt service and operating

2  expense shortfalls, and (iii) capital improvement advances.

3          7.       The Loan provided for, among other things, the repayment of the Loan, including

4  accrued and unpaid interest, by June 9, 2010, with two options to extend the term of the Loan for

5  one year each.   The obligations of the Debtors in connection with the Loan and related

6  promissory notes are secured by a Mortgage, Assignment of Rents and Leases, Security

7  Agreement and Fixture Filing (the "Mortgage") recorded against the Property.   A true and

8  correct copy of the recorded Mortgage is attached hereto as Exhibit "3."

9          8.       At the time the Debtors acquired the Property, in 2006, the occupancy rate in the

10  Property was a dismal 33%.   Since then, the Debtors have invested over $8.5 million in tangible

11  improvements to the Property, including the installation of a fire life system, abatement of

12  asbestos, and extensive remodeling of common areas.   The Debtors have also invested

13  substantial time and resources in rehabilitating the public image and reputation of the Property,

14  including, for example, re-opening its "Grand Banking Hall" to public access and permitting

15  special event rentals in that historic landmark space.

16          9.       In addition, following their acquisition of the Property, the Debtors entered into a

17  Property Management Agreement dated as of May 17, 2007 (the "Management Agreement")

18  with Milbank.   A true and correct copy of the Management Agreement is attached as Exhibit "6"

19  hereto.   Pursuant to the Management Agreement, Milbank acts as the Debtors' exclusive

20  managing agent for the Property.

21          10.      I believe that, as a direct result of the efforts of the Debtors and Milbank, the

22  occupancy rate in the Property has nearly doubled in the last few years, to the current occupancy

23  rate of approximately 64%.

24          11.      On April 10, 2010, the Debtors timely exercised their option to extend the term of

25  the Loan for an additional year, from June 9, 2010 to June 9, 2011.   Based on the business

26  records maintained by the Debtors and Milbank in connection with the Property, all of the

27

28

3

1  required conditions for exercising the first option to extend the term of the Loan were met,

2  specifically, as follows:

3            a.        The Property had earned income sufficient to exceed the minimum debt

4  coverage ratio of 1.5:1.0 continuously since at least January, 2010.

5            b.        The Property had an occupancy rate of at least 63% by *bona fide* tenants

6  since at least three months prior to the maturity date of the Loan.

7            c.        Any tenant that the Lender could potentially attempt to claim as

8  unauthorized or disqualified for purposes of computing the foregoing two conditions had

9  been continuously leasing its space for the requisite period, and the Lender had actual

10  knowledge thereof and did not make any specific objection or rejection to the Debtors or

11  Milbank.

12            d.        The required fee for the exercise of the option to extend the term of the

13  Loan was computed to be $99,638.61, and was tendered to the Lender in such amount

14  with good and sufficient funds.

15            e.        According to the provisions of the Loan agreement governing the Debtors'

16  option to extend the term of the Loan, the Lender became entitled to reasonably verify the

17  continued satisfaction of the conditions for the Debtor's exercise of such option.  All

18  supporting documents requested by the Lender and its attorneys were promptly made

19  available.  In addition, physical access to the Property was provided to the Lender on

20  multiple occasions during the month of June 2010, ostensibly to allow the Lender to

21  reasonably verify that the conditions for the Debtors' exercise of their extension option

22  were met.

23  12.       The Debtors paid every installment payment due under the terms of the Loan

24  through the original maturity date of the Loan (including the June 2010 interest payment).

25  13.       On or about June 18, 2010, the Lender filed a petition for foreclosure against the

26  Debtors in the District Court of the State of Oklahoma, Oklahoma County ("State Court"),

27  thereby commencing that State Court action bearing the number CJ-2010-5129.  Pursuant to its

28

4

1    petition for foreclosure, the Lender alleged that the Loan had matured and sought to foreclose

2    against the Property.  Also in its petition for foreclosure, the Lender asserted that it was owed the

3    principal sum of $19,927,721.68, plus accrued interest in the sum of $159,853.20 (as of June 9,

4    2010), plus interest at the rate of $6,940.81 per day from and after June 9, 2010, plus such other

5    costs, charges, expenses and attorneys' fees as may be allowed by law.  In connection with the

6    State Court action, the Lender also filed a motion seeking the appointment of a receiver to

7    operate and manage the Property.

8        14.    Despite the State Court's requests that the parties meet and confer regarding a

9    possible extension of the Loan on terms mutually agreeable to the Lender and the Debtors, the

10   Lender refused to participate in any such settlement discussions.

11       15.    I believe that the appointment of a receiver will result in considerable irreparable

12   damage as it will diminish the value of the Property and hinder the ability of the Debtors to

13   extend the term of the Loan, refinance the Property and/or sell the Property.  The appointment of

14   a receiver will likely result in the following immediate and negative consequences:  (i) the

15   Debtors' ability to retain existing tenants and attract new tenants will be severely compromised

16   due to the public perception that the Property may be insolvent, poorly managed or poorly

17   maintained, resulting in a decline in rental income and an increase in the lease default rate; (ii)

18   the cost of operating and maintaining the Property will increase with the added cost of a receiver;

19   (iii) the Property is unlikely to be managed properly or effectively, particularly given the unique

20   characteristics of the Property, a historic landmark building with nearly 1 million square feet of

21   rentable space, and the large number of existing tenants; (iv) the resale value of the Property to

22   potential buyers will immediately drop; and (v) the Debtors' ability to obtain any refinancing or

23   debt restructuring with any other lender will be jeopardized.

24       16.    As a result of all the foregoing, FNBI sought protection under Chapter 11 of the

25   Bankruptcy Code in order to continue operating the Property in an effective and cost-efficient

26   manner, to preserve and maximize the value of the Property, and to have the ability and

27   opportunity to sell or refinance the Property, all of which will allow the Debtors to repay the

28

5

1    Loan and their other debts for the benefit of all creditors.  Since the Petition Date, the FNBI has

2    received income derived primarily, if not entirely, from rent received from the Debtors'

3    commercial and residential tenants in the Building.

4                      **Description Of The Debtors' Assets And Debts**

5            17.    I believe that the primary assets of the Debtors' bankruptcy estates consist of the

6    Property and the fixtures and personal property located at or on the Property.

7            18.    Pursuant to an appraisal commissioned by the Lender from Cushman &

8    Wakefield of Texas, Inc. (the "Lender's Appraisal"), as of December 8, 2008, the Property was

9    valued at approximately $26 million (in "as-is" condition).  A true and correct copy of the

10   written report reflecting the results of the Lender's Appraisal is attached as Exhibit "4" hereto.

11   The Lender's Appraisal projected that the value of the Property would continue to increase over

12   the next five years to a value of approximately $39.5 million "upon stabilization."  Based on my

13   experience in the real estate industry and my knowledge of the real estate market in Oklahoma, I

14   estimate that the current value of the Property is at least $28 million.  This valuation is entirely

15   consistent with the conclusions set forth in the Lender's Appraisal.

16           19.    The Debtors' primary creditor is the Lender.  In its petition for foreclosure filed in

17   State Court, the Lender asserted that it was owed the principal sum of $19,927,721.68, plus

18   accrued interest in the sum of $159,853.20 (as of June 9, 2010), plus interest at the rate of

19   $6,940.81 per day from and after June 9, 2010, plus such other costs, charges, expenses and

20   attorneys' fees as may be allowed by law.  Accordingly, even by the Lender's own calculations

21   (which the Debtors dispute), the Lender holds a claim as of October 8, 2010 in the approximate

22   sum of $20,927,413, plus other allowed costs, charges, expenses and attorneys' fees (if any).  As

23   noted above, the obligations of the Debtors in connection with the Loan are secured by the

24   Mortgage, pursuant to which the Lender asserts liens against the Property, the fixtures and

25   personal property located at or on the Property, as well as the Debtors' cash, which is derived

26   primarily, if not entirely, from rent received by the Debtors from their tenants.

27

28

1      20.    It is my understanding and belief that there are a number of subcontractors who

2   have recorded mechanic's liens against the Property.  The Debtors believe that the total amount

3   of the mechanic's liens recorded against the Property, as of the Petition Date, was approximately

4   $506,000.[1]  Additionally, there appears to be a judgment lien recorded by Oklahoma Gas &

5   Electric Company and tax liens recorded by the Oklahoma Tax Commission against the

6   Property.  Even if the foregoing liens are valid and enforceable (which the Debtors do not

7   concede), such liens against the Property do not result in a security interest against the Debtors'

8   cash and rent revenue.

9      21.    In addition to the debts described above, I believe that the Debtors have a total of

10   approximately $3.5 million of unsecured debt.

11     **The Need For Use Of Cash Collateral And Proposed Operating Budget**

12      22.    A copy of the Debtors' joint operating budget for the approximately 45-day

13   period following the Petition Date (the "Budget") is attached as Exhibit "1" hereto.  The Budget

14   reflects rent revenue of approximately $470,000 per month which I expect will be generated by

15   the Property and the expenses I expect will be incurred to maintain and operate the Property,

16   including, among other things, insurance, utilities, parking, security services, janitorial services

17   and other operational costs associated with the Property.

18      23.    Without the ability to use cash collateral to pay its ongoing operating expenses, I

19   do not believe the Debtor will be able to continue maintaining the Building, which I believe will

20   ultimately result in the loss of tenants and all of the Debtor's rent revenue.

21      24.    Pursuant to the Cash Collateral Motion, the Debtors seek Court authority to use

22   their cash collateral in order to pay the expenses of maintaining and operating the Property in

23   accordance with the Budget. In addition, the Debtors seek authority to use their cash collateral to

24   pay all quarterly fees owing to the Office of the United States Trustee and all expenses owing to

25   the Clerk of the Bankruptcy Court.  The Debtors also seek authority to deviate from the line

26

27       [1] The Debtors do not acknowledge the validity of any of the mechanic's liens that have been
recorded against the Property and expressly reserve all of their rights, claims and defenses with respect to

28   such liens.

1    items contained in the Budget by not more than 10%, on both a line item and aggregate basis,

2    with any unused portions to be carried over into the following week(s).

3        25.    A proposed form of the order granting the Cash Collateral Motion is attached as

4    Exhibit "5" hereto.

5                    **Debtors' Existing Cash Management System**

6        26.    The Debtors co-own the Property as tenants in common (with equal ownership

7    interests in the Property).  Unlike a corporation or partnership, which can open one bank account

8    into which all revenue is deposited and from which all operating expenses are paid, it is my

9    understanding and belief that tenants in common cannot open a "joint" bank account for such

10   purposes.  As a result, the Debtors have no choice but to maintain separate bank accounts.  If the

11   Debtors were to operate the Property themselves, without the assistance of a property

12   management company, each of the Debtors would have to write a check (from their respective

13   bank accounts) for exactly half the amount of every operating expense, and tenants would have

14   to write checks to each of the Debtors for exactly half of the amount of their rent.  I believe such

15   a situation would create practical problems for the Debtors, particularly on an accounting level,

16   as well as for current and prospective tenants and vendors, who may be dissuaded from doing

17   business with the Debtors due to the administrative hassles involved.

18       27.    Accordingly, the collection and deposit of rent from tenants in the Property, and

19   the disbursement of funds to pay operating expenses of the Property have historically been

20   handled by Milbank, in accordance with the terms of the parties' Management Agreement.  In

21   connection with such activities, Milbank utilizes a central operating account that it maintains (as

22   agent for the Debtors) at United Central Bank, an FDIC-insured bank.  Pursuant to the terms of

23   the Management Agreement, the central operating account is maintained by Milbank solely for

24   the Property and is not commingled with funds from other clients of Milbank or with Milbank's

25   own funds.  The Debtors historically have not maintained, and as of the Petition Date, did not

26   maintain any bank accounts in their own names.  The Debtors have employed their existing cash

27   management system with the consent of the Lender.

28

1     28.    The Debtors seek Court authority to maintain their pre-petition cash management

2  system.  Specifically, the Debtors seek to have Milbank continue to collect rent from tenants in

3  the Property, deposit such rents into a central operating account maintained and controlled by

4  Milbank, and disburse funds from such operating account to pay the operating expenses of the

5  Property.  Further, the Debtors seek Court authority to establish a new central operating account,

6  if the Debtors and Milbank so elect, provided that the central operating account is established at

7  an FDIC-insured bank.    The Debtors will report all rent revenue received by Milbank in

8  connection with the operation of the Property, all funds deposited by Milbank into the central

9  operating account, and all expenses paid by Milbank from the central operating account as part

10  of the Debtors' monthly operating reports and as otherwise required by the United States Trustee

11  Guidelines, Bankruptcy Code and Federal Rules of Bankruptcy Procedure.

12                                           **Utilities**

13     29.    To maintain and operate the Building, the Debtors receive (i) electricity utility

14  services from OG&E Electric Services ("OG&E"), (ii) gas utility services from Oklahoma

15  Natural Gas Co., (iii) water and sewer services from the city of Oklahoma City, (iv) heating and

16  cooling services from Trigen-Oklahoma City Energy Corporation, and (v) telephone services

17  from Cox Communications Inc. (collectively, the "Utility Companies").  Given the importance

18  of the services provided by the Utility Companies to the Debtors' businesses, I believe it is

19  crucial that the means of providing adequate assurance to the Utility Companies which provide

20  utility services to the Debtors be determined immediately so that there is no interruption in the

21  services provided.

22     30.    Listed below are the names of the Utility Companies that are currently providing

23  utility services to the Debtors, the type of utility services provided by the Utility Companies, the

24  account numbers with the Utility Companies, and the amount of the cash deposit proposed to be

25  paid to each of the Utility Companies as adequate assurance of payment:

26

| Utility Company | Service | Account No. | Proposed Cash Deposit | Basis of Proposed Cash Deposit |
|---|---|---|---|---|
| | | | | |

9

| | | | | | |
|---|---|---|---|---|---|
| OG&E Electric Services<br>P.O. Box 24990<br>Oklahoma City, OK 73124-0990 | Electricity | 127666515-3 | $78,000.00 | The total amount incurred on this account in the two billing cycles prior to the Petition Date was $158,983.76.  The proposed cash deposit reflects an average monthly payment based on the last two months. |
| Oklahoma Natural Gas Company<br>P.O. Box 219296<br>Kansas City, MO 64121-9296 | Gas | 210287052-1264234 -00 | $600.00 | The total amount incurred on this account in the last 3 months is $1850.84.  The proposed cash deposit reflects an average monthly payment based on the total amount incurred in the last 3 months. |
| City of Oklahoma City<br>P.O. Box 26570<br>Oklahoma City, OK 73126-0570 | Water & Sewer | 250101023188 | $10,000.00 | The total amount incurred on this account in the last 2 months is $20,076.43.  The proposed cash deposit reflects an average monthly payment based on the total amount incurred in the last 2 months. |
| Trigen-Oklahoma City Energy Corporation<br>P.O. Box 681038<br>Milwaukee, WI 53268-1038 | Heating & Cooling | O30 | $87,000.00 | The total amount incurred on this account in the last 2 months is $174,146.06.  The proposed cash deposit reflects an average monthly payment based on the total amount incurred in the last 2 months. |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| Cox Communications P.O. Box 248851 Oklahoma City, OK 73124 | Telephone | 001 6110 059477601 | $950.00 | The total amount incurred on this account in the last 2 months is $1913.01. The proposed cash deposit reflects an average monthly payment based on the total amount incurred in the last 2 months. |
|---|---|---|---|---|
| | | **Total:** | **$176,550.00** | |

31.    The Debtors intend to provide adequate "assurance of payment" by providing the Utility Companies with cash deposits in the amounts proposed above.  The total amount of the cash deposits proposed to be paid is $176,550.  Generally, for each account that the Debtors have with a Utility Company, the Debtors are proposing to provide the Utility Company with a cash deposit in an amount equal to the average monthly payment based on payments made on the account during the past three months.

32.    Prior to the Petition Date, a surety bond was posted by the Debtors in favor of OG&E (the "Bond") in the amount of $148,960.00.  A true and correct copy of the Bond is attached as Exhibit "7" hereto.  The Bond is set to be cancelled on November 11, 2010.  I believe that the Bond provides OG&E with adequate assurance through and including November 11, 2010.  Accordingly, the Debtors request that they only be required to provide a cash deposit to OG&E in the amount set forth in the chart above ($78,000) after the cancellation of the Bond.

33.    In addition to the paying the foregoing cash deposits, the Debtor will bring the Utility Companies current on all post-petition debts owed to such Utility Companies.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 8th day of October, 2010, at Los Angeles, California.

*/s/ M. Aaron Yashouafar*
M. Aaron Yashouafar, Declarant

11